IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE

Assigned on Briefs January 16, 2002

## MARK SPRINGER v. STATE OF TENNESSEE

**Direct Appeal from the Criminal Court for Davidson County**
**No. 96-D-1897     J. Randall Wyatt, Jr., Judge**

<hr>

**No. M2001-01102-CCA-R3-PC - Filed April 5, 2002**

<hr>

Petitioner, Mark Springer, appeals the denial of his petition for post-conviction relief. He asserts that his guilty plea was not knowingly and voluntarily entered due to ineffective assistance of counsel during the plea process. After a thorough review of the record, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed.**

THOMAS T. WOODALL, J., delivered the opinion of the court, in which DAVID H. WELLES and ROBERT W. WEDEMEYER, JJ., joined.

Dwight E. Scott, Nashville, Tennessee, for the appellant, Mark Springer.

Paul G. Summers, Attorney General and Reporter; Jennifer L. Bledsoe, Assistant Attorney General; Victor S. Johnson, III, District Attorney General; and Katrin Novak Miller, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### Background

In October 1996, the Davidson County Grand Jury returned indictments against Petitioner for first degree murder committed during the perpetration of a felony, aggravated robbery, attempted aggravated robbery, and two counts of attempted first degree murder. Pursuant to a negotiated plea agreement, Petitioner pled guilty on November 21, 1997 to facilitation of first degree murder and received a sentence of twenty-four years as a standard Range I offender. The remaining charges were dismissed.

On November 20, 1998, Petitioner filed a pro se petition for post-conviction relief which alleged, inter alia, that his conviction was based on a guilty plea involuntarily entered without understanding of the nature and consequences of the plea. Petitioner was appointed counsel, who then filed an amended petition on January 20, 2000 and a second amended petition on November

15, 2000. Both amended petitions alleged that Petitioner's attorney committed various errors during the plea process, which constituted ineffective assistance of counsel and rendered his guilty plea involuntary. On April 11, 2001, the post-conviction hearing commenced and the following testimony was presented.

Counsel who represented Petitioner during the plea process testified that, after graduating from law school in 1980, he worked as an Assistant District Attorney in Chattanooga, Tennessee, for approximately three and one-half years. Next, he worked as an Assistant United States Attorney in Jacksonville, Florida and then Nashville, Tennessee. In Nashville, his duties included lead attorney for the organized drug enforcement task force. Counsel entered private practice in 1989.

Regarding this case, Counsel testified that he began his representation of Petitioner in mid-November 1996, approximately one year before the guilty plea was submitted. During the course of that year, he and Petitioner met on at least twenty-five occasions. Initially, their meetings centered on the strength of the State's case and whether a plea agreement was prudent. Counsel testified that he and Petitioner discussed the elements of the offenses charged and what the State would be required to prove. Counsel considered Petitioner "very intelligent."

According to Counsel, the State's proof against Petitioner was substantial. The State had recovered sixteen 9 mm shell casings from the crime scene. The casings were identified as coming from the alleged murder weapon, a 9 mm "Glock" firearm owned by Petitioner. Further, a man named Tony Beard would testify that Petitioner had given him the firearm to sell shortly after the crimes were committed. The State intended to argue that Petitioner unloaded the "Glock" because it was a "hot weapon." While the bullets recovered from the scene retained insufficient characteristics to positively identify them as being fired from Petitioner's weapon, the casings conclusively linked Petitioner to the murder weapon. Counsel discussed the ballistics report with Petitioner. They also reviewed portions of the transcript for the trial which had occurred in the case of Antonio Brewster, one of Petitioner's three accomplices. (Counsel testified that Brewster had been convicted and received a sentence of life without parole.) Another accomplice, Lane Locke, planned to testify for the State and, according to Locke's attorney, his testimony would implicate Petitioner. The State posited that Petitioner was the "lynchpin," in that he planned the crime and then sent for the three accomplices, including Locke, who had recently arrived from Florida and were staying at Petitioner's house. Petitioner's involvement with the three accomplices was further substantiated in his statement to the police, which Counsel had advised Petitioner not to make. (No excerpts of Petitioner's statement were read or discussed at length during the hearing.) In addition, the State recovered a fingerprint of Petitioner's on the car driven by Locke on the day of the crime.

Counsel testified that he and Petitioner had discussed Locke's involvement in the case and the possibility that he might testify at trial. Locke had a history of drug use and was generally an "unsavory character." Locke was also a gun enthusiast, as was Petitioner. The investigation revealed that Locke had pawned or redeemed a 9 mm "Glock" firearm from "Household Pawn" on December 5, 1996, but this did not change the fact that the casings from the crime scene were from Petitioner's gun. Potential witnesses in Petitioner's behalf included his girlfriend, Denise

Stembridge, and his employer, Don Corn. Both worked at the "Deja Vu" strip club: Stembridge was a dancer and Corn was the manager of the club. As relevant to Petitioner's case, Stembridge would have testified that Petitioner had previously tried to avoid contact with James Grant (one of the three accomplices) and that Petitioner had never mentioned to her that he had any plans to rob anyone. Corn would have testified that Petitioner was a "great employee," but also that he was a firearm "fanatic" who was never without a pistol. In addition, Corn would have said that he had a conversation with Petitioner a day or so before the crime, at which time Petitioner confessed that he did not want to go home and "deal with the people at his house." Petitioner had also told Corn that Grant and his buddy wanted Petitioner to help them rob some place, but that he did not want any involvement with what they were planning.

Counsel had filed a motion to suppress some masks, pistols, and other evidence which had been obtained during a search of Petitioner's house. The search was conducted pursuant to a warrant, but Counsel believed that a strong argument could be made that the warrant was based on insufficient probable cause. On the other hand, Counsel also believed that the search issues were not "dispositive" of the case. Therefore, even if Petitioner prevailed on the motion, the prosecution would go forward. The hearing on the suppression motion was still pending during the first stage of plea negotiations. The State offered to accept Petitioner's guilty plea to facilitation of first degree murder and dismiss the remaining charges. The offer was contingent on Petitioner's agreement to a sentence of twenty-five years and a dismissal of his motion to suppress. The State had informed Counsel that, if Petitioner insisted on going forward with the suppression issue, it would rescind its offer to negotiate a plea agreement.

Counsel was aware that Petitioner was unhappy with the conditions at the Metro Jail and the harshness of the State's plea offer. The State's offer was rather firm, however, and subsequent negotiations succeeded in reducing the sentence only one year. In the event that Petitioner opted to go to trial, Counsel asked Robert Byrd, an employee at the Tennessee Parole Board, to estimate the amount of time a defendant could expect to serve on "a twenty-five year sentence at thirty percent." In a letter, Byrd informed Petitioner that twenty-five years at thirty percent would equal a little over seven years, which may be further reduced by other jail credits, and that the average time served for this offense was approximately five years and five months. Counsel testified that Byrd's letter contained numerous "disclaimers," which explained that it was actually impossible to predict exactly when an inmate would be paroled on any given sentence. In reality, there were simply too many uncontrollable variables involved. Counsel claimed that he did not mislead Petitioner or give him any information which differed from that contained in Byrd's letter.

Counsel further testified that, based on the facts of the case, he believed Petitioner's risk of conviction for the offenses charged or facilitation of those offenses to be "considerable." In his opinion, the testimony of the accomplice, Locke, could be corroborated by fingerprint and other evidence. In addition, the ballistics report conclusively linked Petitioner to the murder weapon. (While Counsel testified that he had no specific recollection of reviewing with Petitioner the actual discovery response document containing the ballistics report results, he did recall discussing the shell casings and how they tied the weapon to Petitioner.) Even if Petitioner went to trial and the jury

credited the defense's theories, Counsel believed that the best they could hope for was a conviction for facilitation, the same offense presented in the negotiated plea offer. Counsel testified that although the case was "high profile," in the sense that it had attained some media attention, the recognition it had received did not rise to the level that a request for change of venue would be successful, or even necessary.

Counsel conceded that during his meetings with Petitioner on September 26, 1997 and October 4, 1997, Petitioner appeared to be more interested in going to trial than settling the case. The morning of the plea hearing, the trial judge allowed Petitioner to talk with his family from approximately 9:00 a.m. until 11:30 a.m., at which time Petitioner pled guilty. Counsel testified that, given the alternatives, he believed that this was the "best resolution" of the case. Counsel also maintained that he never instructs a defendant to plead guilty. His practice is to fully advise the client of his or her options, the risks, and ensure that the client comprehends the State's offer, if any. Counsel stated that when he went over the plea agreement with Petitioner, there was no question in his mind that Petitioner knew what he was doing, understood the consequences of the plea, and entered the plea voluntarily.

Counsel testified that Petitioner's family lived in Florida and appeared to care deeply for Petitioner. As a result, they were very involved in the case. Counsel kept them apprized as to how the investigation was proceeding and what evidence had unfolded during discovery. Counsel's correspondence file revealed that he had written approximately ten or more letters to the family which included, among other things, copies of the State's discovery responses, a tape of Petitioner's statement to the police, and information on the law concerning criminal responsibility. The family and Counsel wanted Petitioner to have a future, and both were concerned that Petitioner could receive a life sentence if convicted after a jury trial.

Robert Springer, Petitioner's father, testified that he hired Counsel to represent Petitioner after the indictments were returned. He stated that Counsel communicated regularly with Petitioner's family and kept them apprised of what was transpiring during the case investigation. Mr. Springer confirmed that he and other members of the family were present at the plea hearing. However, Mr. Springer was under the impression that the purpose of that particular proceeding was to hear Petitioner's suppression and severance motions. To his knowledge, Petitioner had not wanted to plead guilty. Nevertheless, after Counsel informed Petitioner's family that the State's offer was the best they would get and "implied" that they should "encourage" Petitioner to take the plea, Mr. Springer also suggested that Petitioner accept the plea agreement. In Mr. Springer's opinion, Counsel was a "well-respected and good attorney," who also did a good job representing Petitioner. Since the date of the plea hearing, however, additional information caused him to rethink his advice to his son. When asked what additional information he was referring to, Mr. Springer replied that his son's dissatisfaction with the plea agreement and other evidence that his son considered important to present at trial had caused him to doubt the wisdom of Petitioner's plea. Mr. Springer admitted receiving a copy of Byrd's letter but also claimed that, based on his conversations with Counsel, he believed that Petitioner's sentence would be three to five years.

Petitioner testified that Counsel met with him approximately twelve times prior to the plea hearing and that he was opposed to pleading guilty throughout their discussions concerning the case. On the day of the plea proceeding, Petitioner arrived at court anticipating a hearing on his motions to suppress evidence and sever the trial. He claimed that up to this point he had not even considered entering a plea, even though Counsel discussed it with him at every opportunity. Petitioner identified his signature on the plea agreement. He also acknowledged that he and Counsel read the document together before he signed it, but claimed that he still did not understand what was meant by the charge (facilitation to commit first degree murder). Petitioner admitted that Counsel provided him with a copy of the Pattern Jury Instructions on facilitation. Nevertheless, he was still confused.

With regard to the State's evidence against him, Petitioner testified that Counsel discussed the evidence accumulated by the prosecution and provided him with a copy of the State's discovery response. It was Petitioner's understanding that the testimony of one of the accomplices, Lane Locke, combined with the State's introduction of the guns seized during a search of Petitioner's house, would probably be sufficient to convict him if he chose to go to trial. Petitioner claimed that he was unaware any additional inculpatory proof existed, including the fingerprint evidence, and that he never saw the ballistics report (contained in the State's second discovery response). He was also unaware that the shell casings had been linked directly to his weapon or that the bullets recovered from the crime scene could not be matched to his weapon. Petitioner maintained he was informed only that "they had reached some conclusions" regarding this evidence. Petitioner's counsel then showed Petitioner a copy of the fingerprint report, which he admitted having seen before. Petitioner further admitted that, during the Summer of 1997, he learned that the shell casings were positively linked with his weapon but that the bullets were not. This information was gleaned from transcripts of the trial of an accomplice, Brewster. Petitioner testified that, even though he was aware (prior to his plea) that the State could not link the bullets to his weapon, he had wanted to see the actual ballistics report, and, if he had seen the report, he would not have pled guilty. By way of explanation, Petitioner stated: "My interpretation is that if they can't conclude that the bullets came out of my gun, it's--it's debatable as to whether or not they could indicate that my gun was even at the crime scene."

Regarding the alleged murder weapon, Petitioner further testified that he knew Tony Beard and that he gave Beard a 9 mm "Glock" to sell or trade for him. He denied ever telling Beard that the gun was "hot." Petitioner and Counsel had discussed suppressing the evidence seized from his house, which included the guns, but Counsel told him that the motion would be pointless if he pled guilty.

When Petitioner arrived at court on the morning of the plea proceeding (but anticipating a hearing on his motions to sever and suppress evidence), he was taken downstairs where the trial court had granted his family permission to speak with him. Counsel then stated, "We're not going to have this motion to suppress. We have to settle this case and we need to do it today." Petitioner did not want to plead guilty, but listened to his family tell him for more than two hours that he needed to enter a plea that day. Counsel warned him that, if he did not accept the State's offer, the trial judge would not suppress the evidence, the case would go to trial, after which he would be

found guilty and receive consecutive sentences on all charges. Counsel advised Petitioner to be open-minded and consider a plea, even though he was aware that Petitioner did not want to plead guilty.

With regard to possible defenses, Petitioner asserted that Counsel stated, "[T]here really wasn't going to be any, that the State would put Locke on the stand, introduce the guns and that's it." Petitioner gave Counsel the names of two witnesses who might be able to testify on Petitioner's behalf: his girlfriend, Denise Stembridge and his boss, Don Corn. Counsel interviewed both of them.

On the issue of sentencing, Counsel informed Petitioner that he had only been able to get the State to reduce the sentence in the plea offer one year, from twenty-five to twenty-four years. Counsel said that if Petitioner pled guilty, he would only serve three to five years before release. Petitioner acknowledged that this information conflicted with the information previously received from both Counsel and Byrd, via his letter. However, Counsel informed him that the information received thus far was calculated for an "average person." Because Petitioner was "above average," he would be released in significantly less time. Later, an Institutional Parole Officer advised Petitioner that he would not be released until he had served at least twelve years.

In sum, Petitioner testified that he entered his plea of guilty to "appease" his family and attorney and that, obviously, he did not understand the consequences of his plea because he believed that it would result in a sentence of only two to four additional years (over that time previously served). Further, Petitioner maintained that his plea could not be considered "voluntary," because he was not presented with a "viable choice" in the matter.

During cross-examination, Petitioner was questioned as to whether he answered truthfully when the trial judge asked him whether he understood what specific rights he was relinquishing when he entered a plea of guilty. Petitioner responded affirmatively. Petitioner also conceded that he changed his mind about pleading guilty after the discussion with his family and, further, that he informed the trial judge that his decision was "voluntary." With regard to the sentencing issue, Petitioner admitted that his parole board recently denied his parole because he refused to make a statement, and that he was unable to make a statement because the post-conviction hearing was still pending. Consequently, he had to wait four more years before being reconsidered for parole. Petitioner's complaint concerning the deficiency of information given him regarding his case appeared to center on his belief that he had not received the actual fingerprint or ballistics reports from the Tennessee Bureau of Investigation. However, he admitted that Counsel provided him with the discovery responses.

On April 30, 2001, the post-conviction court entered an order denying Petitioner relief. Specifically, the post-conviction court found the following: Counsel was a very experienced, highly competent, and well-respected criminal defense attorney, whose representation of Petitioner in this matter was conscientious and well within the range of competence demanded of criminal defense attorneys. In addition, the court found that Petitioner was sufficiently advised of his constitutional

rights as required under Boykin v. Alabama, 395 U.S. 238 (1969), and State v. Mackey, 553 S.W.2d 337 (Tenn. 1977), and, further, that the resulting plea was entered knowingly, intelligently and voluntarily, thus passing constitutional muster in accordance with Brady v. United States, 397 U.S. 742 (1970). Finally, based on the testimony presented at the hearing and in the transcript of the plea proceeding, the post-conviction court concluded that Petitioner understood his rights and the terms of the plea agreement to the extent that he knowingly, voluntarily, and intelligently chose to forgo a jury trial and plead guilty under the agreed terms.

**Analysis**

Petitioner claims that his counsel failed to properly handle the pre-trial proceedings and investigation in his case and that this failure constituted ineffective assistance of counsel. Petitioner further contends that counsel's ineffective assistance caused him to enter a guilty plea that was not knowing or voluntary. We disagree.

To succeed on a claim of ineffective assistance of counsel, a petitioner bears the burden of showing both that his counsel's performance was deficient and that this deficient performance prejudiced the outcome of the proceeding. See Strickland v. Washington, 466 U.S. 668, 687, 104 S. Ct. 2052, 2064, 80 L. Ed. 2d 674 (1984). To satisfy the first prong of this two-prong test, the petitioner must show that "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." Id. Put another way, counsel's acts or omissions must be "so serious as to fall below an objective standard of reasonableness under prevailing professional norms." Id. at 687-688, 104 S. Ct. at 2064-2065; see also State v. Burns, 6 S.W.3d 453, 462 (Tenn. 1999). In Tennessee, satisfaction of the first prong requires a showing that counsel's performance was not within the range of competence demanded of attorneys in criminal cases. Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975). A "fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." Strickland, 466 U.S. at 689, 104 S. Ct. at 2065. It is not this Court's function to second-guess tactical and strategic decisions pertaining to defense matters. Henley v. State, 960 S.W.2d 572, 579 (Tenn. 1997). Judicial scrutiny of an attorney's representation must be highly deferential, see Strickland, 466 U.S. at 689, unless counsel's choices were uninformed because of inadequate preparation. See Hellard v. State, 629 S.W.2d 4, 9 (Tenn. 1982).

As previously noted, a petitioner must establish prejudicial, and not merely deficient, performance by trial counsel. In order to establish prejudice, a petitioner must demonstrate a reasonable probability that but for the defective performance of counsel, the result of the proceeding would have been different. Strickland, 466 U.S. at 694, 104 S. Ct. at 2068; Henley, 960 S.W.2d at 579. In the context of a guilty plea, the petitioner must demonstrate a reasonable probability that, but for counsel's errors, the petitioner would not have pled guilty and would have insisted upon going to trial. Hill v. Lockhart, 474 U.S. 52, 59, 106 S.Ct. 366, 370 (1985); House v. State, 44 S.W.3d 508, 516 (Tenn. 2001). A reasonable probability is a probability sufficient to undermine confidence in the outcome. Strickland, 466 U.S. at 694, 104 S. Ct. at 2068.

-7-

Because a petitioner must establish both prongs of the test to prevail on a claim of ineffective assistance of counsel, failure to prove either deficient performance or resulting prejudice provides a sufficient basis to deny relief on the claim. Henley, 960 S.W.2d at 580. Indeed, a court need not address the components in any particular order or even address both if the defendant makes an insufficient showing of one component. Strickland, 466 U.S. at 697, 104 S. Ct. at 2069; Goad v. State, 938 S.W.2d 363, 370 (Tenn. 1996).

The post-conviction petitioner bears the burden of proving his allegations by clear and convincing evidence. See Tenn. Code Ann. § 40-30-210(f) (1997). When an evidentiary hearing is held in the post-conviction setting, the findings of fact made by the court are conclusive on appeal unless the evidence in the record preponderates against those findings. State v. Burns, 6 S.W.3d 453, 461 (Tenn. 1999); Tidwell v. State, 922 S.W.2d 497, 500 (Tenn. 1996). By contrast, the post-conviction court's conclusions of law are reviewed purely de novo. Burns, 6 S.W.3d at 461. The issue of ineffective assistance of counsel presents mixed questions of law and fact. Therefore, our review is de novo, with a presumption of correctness given to the post-conviction court's findings of fact. Fields v. State, 40 S .W.3d 450, 458 (Tenn. 2001); Burns, 6 S.W.3d at 461.

## I. Performance of Counsel

Petitioner's claim that Counsel failed to properly handle the investigation and pre-trial proceedings in his case is based on a variety of contentions which, for the following reasons, do not entitle him to relief. To begin, Petitioner argues that Counsel should have tested a 9 mm weapon owned by an accomplice (Locke) and similar to Petitioner's (which was alleged to be the murder weapon). He contends that it may have been "significant in the defense of the case" or useful to impeach Locke in the event they went to trial. However, Petitioner's brief fails to show how Locke's gun could prove "significant" or what impeachment value would be reaped from the fact that he owned a gun similar to Petitioner's. Moreover, the record reflects that the shell casings discovered at the scene had already been matched with Petitioner's weapon. Based on these facts we cannot conclude that counsel's decision to forgo investigation of Locke's weapon, if it was error, was an error so serious that counsel was not functioning as the counsel guaranteed a defendant by the Sixth Amendment.

Petitioner also argues that Counsel erred by refusing to take advantage of evidence favorable to the defense. In his brief, Petitioner claims that he gave Counsel the names of two witnesses, Stembridge and Corn, "both of whom substantiated [his] position that he wanted nothing to do with either [of the accomplices]" or with what they were planning. During the post-conviction hearing, Counsel conceded that this would have been favorable evidence at trial. However, the transcript indicates that Counsel was also concerned that Corn's testimony would additionally reveal other facts not so beneficial, i.e., that Petitioner was a firearms fanatic who had previously discussed wanting to "do jobs and rob places." Counsel believed that the jury might not buy the theory that, although Petitioner was interested in committing armed robberies and even brought people from Florida for that purpose, he nevertheless failed to foresee the possibility of *this* crime. Whatever the case, we have concluded that Counsel's evaluation of the above testimonial evidence pertained to

defense strategy. As previously stated, it is not the function of this Court to second-guess tactical and strategic decisions pertaining to defense matters. Since Counsel interviewed the witnesses, we also find that his decision to forgo any substantial reliance on this testimony was not deficient representation.

Additionally, Petitioner asserts that Counsel rendered ineffective performance by failing to go forward with the motion to suppress evidence in his case. According to Petitioner, on the morning of November 21, 1997, he came to court expecting to have a hearing on a suppression motion and a severance motion. Upon his arrival, he discovered that in lieu of going forward with the motions, Counsel had requested that the trial judge allow him to have a discussion with his family concerning a plea agreement. Petitioner claimed that this "surprised" both him and his family. Following a discussion which lasted more than two hours, Petitioner chose to plead guilty. A client may be "surprised" by his attorney's actions for many reasons. This does not necessarily correlate with error on the part of counsel. The record does not indicate that, in the event Petitioner ultimately rejected a plea agreement, Counsel would have refused to go forward with the motion to suppress. Counsel testified that Petitioner's decision to plead guilty, as between the alternatives available, was the "best resolution of the case" in his opinion. Accordingly, we find that Counsel's postponement of the motion hearing to allow further discussion of a plea agreement was a strategic decision on his part and executed with Petitioner's best interests in mind. Again, this Court will not second-guess tactical and strategic decisions pertaining to defense matters unless it appears that Counsel's choice was uninformed because of inadequate preparation. Counsel's motion to suppress and memorandum of law suggests that Counsel was adequately prepared to go forward with the motion. It appears that, because he considered the issues not "dispositive," he arranged an opportunity for Petitioner to reconsider a plea agreement. In fact, this was an especially important action to take at this time, since going forward with the motion would have resulted in the State rescinding its plea offer. Under the circumstances, Counsel's performance was well within the range of competence demanded of attorneys in criminal cases.

## II. Voluntariness of Plea

Petitioner further asserts that, if trial counsel had properly and accurately informed him of the evidence against him and the sentencing consequences of his plea, he would not have pled guilty in lieu of going to trial. Specifically, Petitioner contends that his plea was not voluntarily or intelligently entered because (1) he was not provided with full and accurate information concerning the evidence in the State's case against him; (2) he did not understand the consequences of his plea because he was given incorrect information concerning the length of the sentence he would serve; and (3) he was "ambushed" by his attorney and then pressured by his family to plead guilty, which rendered his plea constitutionally infirm as the result of coercion.

According to our supreme court, "[t]he cases of Boykin v. Alabama and State v. Mackey are the landmark constitutional cases for analyses of guilty pleas." State v. Pettus, 986 S.W.2d 540, 542 (Tenn. 1999) (citing Boykin v. Alabama, 395 U.S. 238, 89 S. Ct. 1709, 23 L. Ed. 2d 274 (1969) (outlining federal standard), and State v. Mackey, 553 S.W.2d 337 (Tenn. 1977) (Tennessee's

standard for accepting a guilty plea imposed additional safeguards beyond the federal standard)). In Boykin, the United States Supreme Court held that before a guilty plea is accepted, there must be an affirmative showing in the trial court that the plea was voluntarily and knowingly given. Id. (citations omitted). To this end, the trial court must discuss the matter with the accused to ensure that he has a full understanding of what the plea connotes as well as its consequences. Id. In Mackey, the Tennessee Supreme Court held that "the record of acceptance of a defendant's plea of guilty must affirmatively demonstrate that his decision was both voluntary and knowledgeable, i.e., that he has been made aware of the significant consequences of such a plea . . . ." Mackey, 553 S.W.2d at 340. In North Carolina v. Alford, 400 U.S. 25, 31, 91 S. Ct. 160, 164, 27 L. Ed. 2d 162 (1970), decided the year after Boykin, the United States Supreme Court noted that "[t]he standard was and remains whether the plea represents a voluntary and intelligent choice among the alternative courses of action open to the defendant."

In determining whether a defendant's plea is "voluntary" and "intelligent," our supreme court stated that a court must consider various circumstantial factors, such as

> The relative intelligence of the defendant; the degree of his familiarity with criminal proceedings; whether he was represented by competent counsel and had the opportunity to confer with counsel about the options available to him; the extent of advice from counsel and the court concerning the charges against him; and the reasons for his decision to plead guilty, including a desire to avoid a greater penalty that might result from a jury trial.

Blankenship v. State, 858 S.W.2d 897, 904 (Tenn. 1993). Further, a plea precipitated by ignorance, incomprehension, coercion, terror, inducements, or threats, may not be considered "voluntary." Id. (citing Boykin, 395 U.S. at 242-3, 89 S. Ct. at 1712).

Petitioner first alleges that Counsel never provided him with the State's second discovery response, which contained the ballistics information indicating that the bullets recovered from the crime scene could not be matched to his weapon. Petitioner complains that had he been aware of this fact, he would not have pled guilty. Conversely, Counsel testified that he and Petitioner had discussed the fact that the prosecution could not tie the bullets to Petitioner's weapon due to the nature of 9 mm weapons. Thus, the issue whether Petitioner had a full and accurate appraisal of the prosecution's case against him turns on the credibility of the respective witnesses, Counsel and Petitioner. The trial court credited Counsel's testimony and we conclude that the evidence does not preponderate against its conclusion. During the post-conviction hearing, Petitioner initially asserted that he did not see the State's second discovery response. A short time later, he acknowledged that he received the discovery response--it was the ballistics report from the Tennessee Bureau of Investigation that was missing. Whatever the case, Petitioner admitted that, during the summer of 1997, he became aware that the shell casings were positively linked with his weapon but the bullets were not. His guilty plea was entered in November 1997. Thus, Petitioner was aware that the bullets in evidence did not match his weapon for *at least a few months* prior to his plea hearing. This claim has no merit.

Petitioner also contends that he did not understand the consequences of his plea because Counsel gave him erroneous information regarding the length of the sentence he would serve. Defendant is correct in his assertion that a valid guilty plea requires that the defendant must be aware of the "direct consequences" of the plea. Blankenship, 858 S.W.2d at 905 (citations omitted). One of the most obvious "direct consequences" of a conviction is the penalty to be imposed. Here, Petitioner claims that he expected to serve only two to four years, in addition to that time he had already spent in jail. By contrast, Counsel testified that he had secured the assistance of Robert Byrd, an employee at the Tennessee Parole Board, for the purpose of estimating the amount of time Petitioner could expect to serve on a twenty-five year sentence at thirty percent. This was the State's then-current offer. Per Counsel's request, Byrd informed Petitioner by letter that the sentence offered would probably amount to a little over seven years and that the average time served for this offense was approximately five years and five months. Counsel also testified that Byrd's letter contained numerous "disclaimers," explaining that it was *actually impossible to predict exactly when an inmate would be paroled on any given sentence*, because too many uncontrollable variables were involved. Lastly, Counsel claimed that he did not mislead Petitioner or give him any information which differed from that in Byrd's letter.

Thus, the issue whether Petitioner was aware of the direct consequences of his plea, namely, the length of the sentence to be imposed, again turns on the credibility of two witnesses, Petitioner and Counsel. The trial court credited the testimony of Counsel. The record reflects that the length of Petitioner's sentence was explicitly stated in the plea agreement: "The Defendant shall receive a sentence of twenty-four (24) years incarceration at 30% as a Standard Range I Offender." Thirty percent calculates to 7.2 years. Mr. Byrd's letter contained similar information, along with numerous "disclaimers" which attested that a precise calculation was "actually impossible." Counsel testified that the information he gave his client on this matter did not differ from that in Byrd's letter. Apparently, the trial court did not believe Petitioner's claim that an experienced and competent attorney, such as Counsel in this case, would advise him that since he was "above average," the law and standard rules governing eligibility release would not apply to him. The trial court further found that Petitioner was aware of the significant consequences of his guilty plea prior to entering the plea, in accordance with State v. Mackey, 553 S.W.2d 337, 340 (Tenn. 1977). Once again, we are unpersuaded that the evidence preponderates against the trial court's findings.

Petitioner further argues that he was "ambushed" by his attorney and then pressured by his family to plead guilty, thereby rendering his plea the result of coercion and, thus, invalid. We disagree. The record reflects that both his father and Counsel believed a guilty plea to be the best resolution of Petitioner's case. Under the circumstances, it is therefore absurd to expect them to recommend any other course of action. The transcript of the guilty plea hearing reveals that the trial court carefully and correctly informed the petitioner at length regarding his constitutional rights, and specifically asked if he understood that he was waiving those rights by pleading guilty. Petitioner responded affirmatively to all questions. Further, he stated that he understood the plea agreement and the significance of the guilty plea hearing, and was entering his guilty plea *voluntarily*.

After also considering the various circumstantial factors suggested in <u>Blankenship v. State</u>, 858 S.W.2d 897, 904 (Tenn. 1993), we conclude that Petitioner's guilty plea was knowingly, intelligently, and voluntarily entered. Petitioner's relative intelligence is above average. The degree of his familiarity with criminal proceedings may not be significant. However, he was represented by competent counsel and had the opportunity to confer with counsel, extensively, for approximately one year about the options available to him. Most compelling to us are the obvious reasons for his decision to plead guilty, which include the desire to avoid a life sentence and possibly four additional convictions.

For the forgoing reasons, we find that counsel's performance was well within the range of competence demanded of attorneys in criminal cases and, further, that Petitioner's guilty plea was entered intelligently, knowingly, and voluntarily. Petitioner is not entitled to relief on this issue.

## Conclusion

Accordingly, we AFFIRM the judgment of the post-conviction court.

_____
THOMAS T. WOODALL, JUDGE